UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TONY TOOMBS, | ) |
|     Plaintiff, | ) |
| v. | )    CIVIL NO. 1:05cv104 |
| JOSEPH MARTIN and <br> JOHN KAUFFMAN, | ) |
|     Defendants. | ) |

## OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the remaining defendant in this case, John Kauffman ("Kauffman"), on July 5, 2006.[1]  The plaintiff, Tony Toombs ("Toombs"), proceeding pro se, filed his response on August 9, 2006, to which Kauffman replied on August 16, 2006.

For the following reasons, Kauffman's motion for summary judgment will be granted.

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element

---

[1] The other defendant in this case, Joseph Martin, was granted summary judgment in an order entered March 8, 2006.

essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

     Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

     So that the district court may readily determine whether genuine issues of material fact

2

exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion.  L.R. 56.1

     Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at 248.  Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute.  Id.  The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagree-

ment to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

## Discussion

The following factual background was recited in this court's order of March 8, 2006. During the evening of March 17, 2003 an armed robbery occurred in Marion, Indiana. The victims reported to the Marion Police Department that the armed robbery was committed by a black man wearing gray sweats, approximately 5 feet 9 inches tall, and roughly 180 pounds. Around 1:00 a.m. on March 18, 2003, Officer Martin observed a black man wearing a gray sweat suit walking in the 1800 block of Pearl Street in Marion, Indiana.  Officer Martin thought the individual (who was later identified as Toombs) matched the description of the armed robbery suspect. Officer Martin called dispatch and requested the description of the armed robbery suspect again.  Officer Martin continued to believe that Toombs matched the suspect's description.  Officer Martin was given orders to obtain a digital photograph and identifying information from the individual.

When Officer Martin stopped his marked police car to speak with Toombs, Toombs acted nervous and repeatedly put his hands in his pockets despite Officer Martin's verbal commands to remove his hands from his pockets.  Toombs' suspicious behavior caused Officer Martin to ask Toombs to turn around so that Officer Martin could conduct a pat down for weapons. Toombs ran from Officer Martin.  When Officer Martin caught Toombs he struggled with

Officer Martin and then pulled out a gun. Toombs hit Officer Martin in the back of the head with his gun and shot Officer Martin in the head, ear, and shoulder. Officer Martin returned fire, striking Toombs multiple times.

Toombs was arrested and charged with one (1) count of unlawful possession of a firearm by a serious violent felon, one (1) count of battery with a deadly weapon for shooting Officer Martin, one (1) count of resisting law enforcement for shooting Officer Martin, one (1) count of attempted murder, and one (1) count of being a habitual offender. Toombs was represented by counsel at a jury trial on all five charges.

On August 20, 2004, Toombs was found guilty by a jury of unlawful possession of a firearm by a serious violent felon, resisting law enforcement with a deadly weapon, battery with a deadly weapon$_3$, and being a habitual offender. Toombs convictions were subsequently affirmed on appeal.

In his present excessive force claim, Toombs alleges that "[I] was kicked several times in my face & left-side, and shot at least five-times and cut twice with a knife. I mean absolutely none of these things were necessary and all the while they were calling me racist names." Toombs more specifically alleges that "Ofc Martin shot me for no reason and Kauffman cut me with a knife and kicked me in the head." As noted earlier, this court granted Martin's motion for summary judgment in an order entered on March 8, 2006.

In support of his motion for summary judgment, Kauffman presents the following additional facts. Kauffman was working the evening shift on March 17, 2003. Kauffman heard Officer Martin contact Sergeant Day via the police radio asking Day to repeat the description of the armed robbery suspect and Kauffman heard the reiterated warning that the suspect was

5

armed with a handgun.

Kauffman was in the vicinity of Martin and notified dispatch that he was going to the scene to assist Martin. While en route, he heard Martin state, over the police radio, that he was exiting his car to approach the suspect and he later heard Martin radio him to "step it up." Kauffman could tell by the tone of Martin's voice that the subject was apparently doing something that alarmed him. Kauffman turned on his overhead red and blue emergency lights and sped up.

Kauffman saw Martin's patrol car parked in the 1800 block of Pearl Street and saw Martin on the east side of the street speaking to Toombs. Toombs then turned away from Martin and Kauffman's patrol car and ran southeast. Martin chased Toombs on foot and Kauffman drove his patrol car down the alley to the east of the area to cut off Toombs.

Kauffman saw Martin reach Toombs, saw Toombs spin around to face Martin and raise his gun, and heard him shoot Martin. Kauffman jumped out of his patrol car while Toombs was still pointing his gun at Martin and when Martin fired at Toombs. Kauffman drew his weapon and approached. Toombs turned, ran approximately ten feet, and then fell to the ground. Kauffman pointed his gun at Toombs who was lying on his stomach. Toombs was still holding his gun in his right hand with his index finger on the trigger. Kauffman repeatedly ordered Toombs to let go of his weapon, but he did not comply with the commands. Kauffman radioed a "Code One" and continued to hold Toombs at gun point. After a moment, Toombs finally released his grip on the gun and rolled slightly onto his left side. Kauffman then handcuffed Toombs, moved Toombs' gun away from him, checked on Martin, and waited on additional backup and an ambulance to arrive.

A short time later, two other Marion police officers, Officer Pyle and Officer Thomas, arrived on the scene.  Pyle comforted Martin and Thomas patted down Toombs, assessed his injuries, and retrieved a large sum of cash, a cellular phone and a watch from Toombs' pockets.

Toombs claims that Kauffman subjected him to excessive force during his arrest, in violation of his constitutional rights.  In his deposition, Toombs admitted that he did not see a knife and did not see anyone cut him.  (Toombs Dep. at 46.)  Toombs assumes that he was cut because he sustained an injury.  (Toombs Dep. at 54.)  Toombs admits that when he examined his sweatpants, in the genital area, he saw a small bullet hole, but no cuts from a knife.  (Toombs dep. at 42, 54.)

Kauffman has submitted medical records from Parkview Hospital and Marion General Hospital that show that Toombs sustained injuries to his head and penis in the shooting.  The paramedics report, initial emergency room evaluation, Dr. Chomer at Marion General Hospital, and the initial emergency room report by Dr. Nickel at Parkview Hospital all show that Toombs suffered a gunshot wound to his penis.

Dr. Craig Hamilton provided a urology consultation to assess Tombs' penile injury.  Dr. Hamilton found "a penile injury entering on the right side of the mucous membrane just to the right of the midline, and a second exit wound on the right shaft, extending over the midline slightly to the opposite side."  Toombs was taken in for immediate surgery where the preoperative diagnosis was a gunshot wound to his penis.  Dr. Hamilton performed an "exploration, debridement and closure of gunshot wound to the penis."  The postoperative diagnosis remained the same – "gunshot wound to the penis."

Four weeks later, Toombs was discharged from the Parkview Hospital rehabilitation unit,

7

with a discharge diagnosis of multiple gunshot wounds, including a gunshot wound to the penis. On April 21, 2003, Dr. Craig Marks completed and signed Toombs' discharge summary. The discharge summary showed that Toombs was initially admitted with a diagnosis of "multiple gunshot wounds." The discharge diagnosis included a more detailed list of Toombs' gunshot wounds, including "gunshot wound to penis."

The medical records also show that Toombs sustained a wound to his left temple. The wound was determined to be a grazing injury caused by a fragment of bullet that exited Toombs' left shoulder. Toombs' diagnosis with regards to his temporal injury and his penile injury remained the same throughout his five-week hospital stay, as shown on his discharge report.

In support of his motion for summary judgment, Kauffman first argues that he did not cut Toombs, and that Toombs' claim is not based on any evidence. Kauffman points out that in his deposition, Toombs stated that because he had an injury to his penis, he must have been cut, and one of the two officers on the scene must have cut him. (Toombs Dep. at 54, 63, 64). Kauffman contends that the undisputed medical evidence shows that Toombs was not cut on his penis. Rather Toombs' penis injury was a gunshot wound caused by Martin returning fire on Toombs after Toombs shot him.

Kauffman reiterates that when he reached Toombs, the shooting had ceased and Toombs was lying on the ground with his gun in his hand and his finger on the trigger. Kauffman held Toombs at gunpoint until Toombs dropped the gun. Kauffman then handcuffed Toombs and tended to Martin, who was bleeding profusely from the head. Officer Thomas arrived on the scene and patted down Toombs. Thomas removed items from Toombs' front pants pockets, back pants pockets and front jacket pockets. Once the ambulance arrived, Toombs was

8

transported to the hospital.

The ambulance report, initial emergency room report at Marion General Hospital, initial emergency room report at Parkview Hospital, urology consultation by Dr. Craig Hamilton, preoperative report, postoperative report, rehabilitation admission report, rehabilitation discharge report, and hospital discharge summary all show that Toombs sustained a gunshot wound to his penis. None of the records show any penile injuries from being cut with an unknown object.

Thus, Kauffman argues that the undisputed evidence shows that Kauffman did not cut Toombs' penis. Rather, the record shows that Toombs sustained injuries to his penis as a result of the shots fired by Martin (in response to Toombs shooting him in the head).

In response, Toombs admits that he was not cut on his penis. Toombs now alleges that he was cut on his "right groin" and lower abdomen. Toombs bases his allegation on the fact that he had sutures in his penis and staples in his groin. However, as Kauffman demonstrates in his reply, the medical records do not support Toombs' new allegation that he was cut on his groin or abdomen. The medical records show that the gunshot wound to Toombs' right leg involved injuries to his femoral artery. As a result of those injuries, on March 18, 2003, Toombs underwent a procedure known as "lower extremity revascularization." In this procedure, the surgeons made an incision that revealed Toombs' femoral artery. The femoral artery is the large artery that starts in the lower abdomen and goes into the thigh. See Melloni's Illustrated Medical Dictionary, at p. 43. Eight days later, on March 26, 2003, Toombs underwent an additional procedure that provided "definitive closure" of those surgical wounds. The skin in this surgical wound site (abdomen and right groin) was definitely closed with staples.

In light of this undisputed medical evidence, Kauffman maintains that the existence of

the staples in Toombs' groin does not offer evidence to support his claim that Kauffman cut him. Rather, as the medical records show, the staples are evidence of a surgical procedure to repair the damage done by the gunshot wound in Toombs' right leg.

Kauffman next argues that the undisputed evidence shows that Kauffman did not kick Toombs in the head and side, as Toombs claims. Kauffman reiterates that when he reached Toombs, who was lying on the ground, he held him at gunpoint until Toombs finally dropped his gun. Kauffman then cuffed Toombs and tended to Martin. Thomas searched Toombs and removed items from his pockets. Kauffman asserts that there is no evidence that Toombs was kicked during this process. Kauffman points out that Toombs repeatedly changed, or forgot, his story during his sworn deposition testimony. Toombs first claimed that Kauffman kicked him in the head and in the side, but Toombs could not see Kauffman's shoes. (Toombs Dep. at 19). When Toombs realized that if he had seen the kick he would have seen the shoes, he changed his story. He then admitted that he did not see anyone kick him. Rather, he claimed that a few days later in the hospital he realized that he had been kicked when he felt a small lump on his side and th injuries to his temple. (Toombs Dep. at 44, 45, 46). However, Toombs did not at that time claim that Kauffman kicked him. Rather, a week after Toombs "realized" he had been kicked, he told Sergeant Stephen Dorsey, in a taped interview, that Officer Martin, not Officer Kauffman, kicked him. (Toombs Recorded Statement, at 18-19). Only now, in this litigation, does Toombs claim that Kauffman kicked him.

Toombs is apparently unconcerned with his changing story because he believes he can support his claim that he was kicked by relying on his medical records. (Toombs Dep. at 48-49). However, as Kauffman points out, the medical records do not support Toombs' claims. The

10

medical records do not show that Toombs was kicked, nor do they show any injury to Toombs' side where he claims he was kicked.

Additionally, Toombs' medical records show that his left temporal injury was not from a kick in the head but, rather, that Toombs' left temple was grazed by a bullet fragment exiting his left shoulder. The medical records specifically show that Toombs was found to have a "gunshot wound to the . . . head", a "grazing gunshot wound to scalp", a "grazing wound to the head" and a scalp wound caused by a "fragment of bullet leaving his shoulder" after being "apparent[ly] shot in . . . his head." (Parkview Hospital records, at 54, 254, 306, 313, 314.)

In his response, Toombs does not dispute any of the medical evidence which shows that he did not sustain any injuries consistent with being kicked in the side or the head. Toombs has submitted a "declaration" where he states that he was cut along the right side of his penis and up his stomach. This statement is contrary to the medical evidence in this case, which shows that all of Toombs' injuries were from multiple gunshots. Clearly, Toombs is not qualified to give medical testimony or to testify as to the causation of his injuries. Toombs has admitted that he did not see anyone cut him and that he just assumes he was cut because he sustained an injury. Toombs also admits that when he examined his sweatpants, in the genital area, he saw a small bullet hole, but no cuts from a knife.

It is abundantly clear that there are no material facts in dispute. Toombs' medical records state that he received numerous injuries that required various forms of treatment, including surgery. The medical evidence shows that all of Toombs' injuries were the result of being shot by Martin.

There is absolutely no evidence of excessive force in this case. When analyzing Toombs'

11

excessive force claim, the court must begin with the conclusively established fact that Toombs was a serious felon in possession of a gun, who was fleeing law enforcement and who shot a police officer. This court must then determine if the actions taken by Kauffman were objectively reasonable. Graham v. Connor, 490 U.S. 386, 388 (1989). The facts and circumstances confronting Kauffman at the time he approached Toombs were as follows: Toombs was believed to be a suspect from an earlier armed robbery. Toombs had just shot Martin in the side of the head. Martin had returned fire and shot Toombs. Toombs was lying on the ground with his gun in his right hand and his index finger on the trigger. Toombs refused to drop his weapon when Kauffman repeatedly ordered him to do so.

It is clear to this court that Kauffman's actions of holding Toombs at gun point until Toombs dropped his weapon and then handcuffing Toombs was reasonable. The evidence has established that Toombs did not sustain any injury from Kauffman's actions. Given the facts and circumstances that confronted Kauffman, his use of force was objectively reasonable and thus, not excessive.

In any event, Kauffman is entitled to qualified immunity in this case. A two-part test is applied to analyze a claim of qualified immunity. First, the court must determine whether the plaintiff has asserted a violation of a federal constitutional right. Second, the court must determine whether the constitutional standards implicated were clearly established at the time in question. Eversole v. Steele, 59 F.3d 710, 717 (7th Cir. 1995). The first part of this analysis is a threshold issue. If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of constitutional rights, then the plaintiff's claim fails. id.

"Before a right is 'clearly established' it must be 'sufficiently particularized to put

12

potential defendants on notice that their conduct is unlawful.'" Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988).  Once the defendant's actions are defined or characterized according to the specific facts of the case, that characterization is to be comparted to the law existing at the time of the alleged violation to determine if the specifically defined actions violated the clearly established law.  Id.  "It is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right." Id.

As discussed above, Toombs does not have a cause of action for excessive force against Kauffman and, thus, cannot establish a constitutional violation.  Furthermore, at the time of the incident in question, there was no clearly established law providing that an officer who just seconds before witnesses a suspect, who is a fleeing felon, shoot a fellow officer in the side of the head, cannot respond with the show of authority and use of force employed by Kauffman. Rather, the case law at the time of Toombs' arrest provided that Kauffman could have used much more force, including deadly force.  See Tennessee v. Garner, 471 U.S. 1, 7 (1985); Muhammed v. City of Chicago, 316 F.3d 680, 683 (7th Cir. 2002).

This court finds that Kauffman's actions were objectively reasonable and he is entitled to qualified immunity.  Additionally, the undisputed medical evidence in this case shows that Kauffman did not kick or cut Toombs, and did not use excessive force. Accordingly, summary judgment will be granted in favor of Kauffman.

## Conclusion

Based on the foregoing, Kauffman's motion for summary judgment is hereby GRANTED.


Entered: September 8, 2006.

                                              s/ William C. Lee  
                                              William C. Lee, Judge  
                                              United States District Court